Filed 5/10/16  R.F. v. Superior Court CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| R.F. et al.,<br><br>        Petitioners,<br><br>    v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>        Respondent;<br><br>SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al.,<br><br>        Real Parties in Interest. | D069512<br><br>(San Diego County<br>Super. Ct. No. J516235H) |

PROCEEDINGS for extraordinary relief after reference to a Welfare and Institutions Code section 366.26 hearing.  Sharon Kalemkiarian, Judge.  Petition denied; stay vacated.

Dependency Legal Group and Amanda J. Gonzales for Petitioner R.F.

Dependency Legal Group and Tracy M. De Soto for Petitioner Ahmed B., Sr.

Dependency Legal Group and Pamela Deavours for Petitioners M.P., R.P., H.B., Ahmed B., Jr., Joseph B., Christian B., Abraham B. and Priscilla B., Minors.

No appearance by Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, Lisa Maldonado and Kristen M. Ojeil, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Judith E. Klein for Real Parties in Interest, M.S. and L.S.

R.F. and Ahmed B., Sr., seek review of a juvenile court order terminating reunification services for their minor daughter, Priscilla B., and setting a Welfare and Institutions Code section 366.26[1] hearing. Priscilla and her seven siblings, M.P., R.P., H.B., Joseph B., Ahmed B., Jr., Christian B. and Abraham B. (collectively minors), also seek review of the order. R.F. and Ahmed, Sr., contend the court erred by finding that Priscilla was at substantial risk of detriment if returned to her mother's custody because the finding was not supported by substantial evidence. The minors join in this argument and also contend the court erred by failing to consider their sibling bond.

We reject the petitioners' arguments and conclude sufficient evidence supported the juvenile court's order.

---

[1] Statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

This case was initiated in December 2013 after the County of San Diego's child abuse hotline received a report alleging neglect of the minors. The report stated the children were dirty and unkempt, and had complained of being hungry. On January 1, 2014, police officers visited the house where R.F. and the minors were staying in response to a separate welfare report concerning another child at the same house. The officers observed that the property was extremely filthy and unsanitary; trash and debris were strewn about the house and the yard. One of the police officers observed an infant, later identified as Priscilla, lying alone on a mattress in the family room surrounded by debris.

When the officers knocked on the door, they were greeted by the owner of the house, R.F.'s uncle Matthew J. Matthew told the officers the children belonged to R.F. Fifteen minutes later, while the police were inspecting the home, R.F. arrived. She told the police she had gone to the store to buy food and that Lillie J., Matthew's adult daughter who also resided there and was asleep upstairs, was watching the minors. R.F. explained to the police that she and the minors had moved into the house in November because they had no other place to live. The police contacted child protective services and the eight minors were taken into protective custody.

R.F. was arrested for child cruelty on January 3, 2014. The same day, the San Diego County Health and Human Services Agency (Agency) filed petitions under section 300, subdivision (b) on behalf of each minor. The petitions alleged the minors were "not provided with a suitable home . . . in that, the home was in a state of severe

3

disrepair/filthiness and unsanitariness including . . . miscellaneous trash, clothing and debris strewn throughout the lawn, driveway and home. The home had a strong odor of trash and mold and the kitchen was extremely dirty and contained several dishes containing spoiled food. The backyard contained three old refrigerators and was strewn with broken glass. The home is infested with bugs and cockroaches and is 'not suitable for kids' and . . . places the [minors] at substantial risk of suffering serious physical harm or illness. . . ." The petitions also alleged the father of R.F.'s six youngest children was incarcerated "due to charges including child cruelty and drug/alcohol use."[2]

The minors were initially placed at Polinsky Children's Center and shortly after moved into five separate foster homes: M.P. (age 10 at the time) and Priscilla (3 months) were each placed alone, R.P. (9) and H.B. (7) were placed together, twins Joseph and Ahmed (6) were placed together, and Christian (a few days before turning 2) and Abraham (1 year 2 months) were placed together. The Agency's report for the detention hearing outlined a previous dependency case, which was opened for M.P. and R.P. in 2006. The case was initiated because R.F. had left the minors in the care of her mother, who was a habitual drug user and diagnosed schizophrenic. During that dependency, R.F. gave birth to H.B. and twins Joseph and Ahmed. Voluntary cases were opened for these three minors, but R.F. maintained custody of them throughout the proceeding. R.F. successfully reunified with her two oldest children in 2009.

---

[2]    The father of R.F.'s two oldest children, M.P. and R.P, is deceased.

4

R.F. was interviewed by the Agency's social workers on the day the minors were taken into custody. She told the social worker that the family had moved into Matthew's home a few weeks earlier after leaving the home of Ahmed, Sr.'s, mother. R.F. reported that Ahmed, Sr., had been in custody since May. He was involved in a car accident, which resulted in his arrest for driving under the influence with Ahmed, Jr., in the car. At the time of his arrest, the police found three pounds of marijuana in Ahmed, Sr.'s, car. Ahmed, Jr., was injured in the accident and taken to the hospital, and the Agency was called to investigate. Ahmed, Jr., was released to R.F., who agreed to keep Ahmed, Sr., away from the minors and to move into a shelter.[3] Ahmed, Sr., was eventually charged with child cruelty, DUI with drugs and possession of marijuana in connection with the arrest.

At the jurisdiction and disposition hearing, the juvenile court sustained the petitions, declared the minors dependents of the court and removed them from their parents' custody. The court ordered unsupervised visitation for R.F. and reunification services for both parents. In its report for the hearing, the Agency stated that R.F. was "open and receptive to all support offered to her" and wanted to have the children returned to her as soon as possible. The Agency also reported that R.F. had family and friends willing to provide support to her and the minors. The Agency's social worker assessed the situation as one "where the mother is completely overwhelmed in caring for

---

[3]    R.F. went to a shelter and agreed to remain in the area so that the Agency could assist with services, but she left shortly after and did not maintain contact with the Agency.

5

so many children, and she is severely lacking in financial and community resources to meet the children's needs . . . ."

A. *Six-Month Review Hearing*

In its report for the six-month review hearing, the Agency stated R.F. was "diligently working to change her circumstances and reunify with her eight children." R.F. had obtained a job with a catering company and, despite unpredictable working hours, managed regular and consistent visits with all eight children, and consistently attended therapy appointments. R.F.'s therapist reported that R.F. was on her way to meeting her goals of becoming financially and emotionally independent. Although she had not yet been able to find a suitable residence for her family, R.F. was able to save money and rent a hotel room to have overnight visits with the three oldest children.

At the time of the six-month review hearing all of the minors were doing relatively well in their placements. The minors' foster families were working to bring them up to date with dental and medical care, which had severely lapsed. Priscilla was evaluated and found to be developmentally advanced for her age, and was talking and walking by the time of the review hearing. Ahmed, Sr., remained incarcerated and in May 2014 was sentenced to prison for three years four months. At the review hearing, the juvenile court found R.F. and Ahmed, Sr., had made substantive progress with the provisions of the case plan, ordered continued services for both parents, and set the 12-month review hearing for February 3, 2015.

Before the next hearing, Priscilla's foster parents and Christian and Abraham's foster parents obtained de facto parent status. The Agency's report for the hearing

6

indicated that R.F. had not yet found suitable housing for her family, but had remained employed and continued to actively engage in services and visitation with all of the minors. R.F. made efforts to secure a suitable home, but struggled because of the size of the family, her low income, a prior eviction, and the criminal charges she sustained in connection with the dependency case.

Three court-appointed special advocates (CASA) (one for Priscilla, Christian and Abraham, another for Joseph and Ahmed, Jr., and the third for R.P. and H.B.) reported R.F.'s visits with the minors were positive and appropriate. Both the CASA for Joseph and Ahmed and the CASA for R.P. and H.B. also reported the minors were happy to see R.F. and each other. Despite R.F.'s success in maintaining employment, continued progress in therapy, and consistent visitation, because R.F. had not secured adequate housing for the family, the Agency recommended the termination of reunification services and that the court set a permanency planning hearing. At the initial 12-month review hearing on February 3, 2015, the minors requested a trial as to the five oldest children and both parents contested the Agency's recommendation. The court set the contested matter for a hearing on March 20, 2015.

Before the hearing, however, R.F. became eligible for financial assistance from the Casey Family Foundation (Foundation), an organization dedicated to helping families in the dependency system reunify. On March 13, 2015, Caitlin McCann, a social worker employed by the Foundation and assigned to R.F. and her family, informed the Agency that R.F. had secured keys to a three-bedroom home. McCann told the Agency's social

7

worker that the landlord thought the property would be ready for the family to move into at the end of March after he made several repairs.

On March 15, 2015, R.F. filed a request seeking to postpone the 12-month review hearing to the time for the 18-month review. R.F. stated she had continued to make steady progress with the provisions of her case plan and recently secured suitable housing for her family. R.F. asserted it was in the best interests of the minors to provide time for the Agency to assess her ability to maintain her new housing and engage in overnight visitation with all of the minors. R.F. noted that the school-age minors all expressed a desire to live with her. At the March 20, 2015 hearing, the Agency indicated it was not changing its recommendation that the court set a permanency planning hearing, but that it did not oppose the request for a continuance.

Counsel for the Agency took the position that because of R.F.'s inability to obtain housing, the Agency had not been able to assess R.F.'s progress in alleviating the initial protective risk. The Agency's counsel asserted that after R.F. moved into her new home, the Agency would assess the home and implement a structured visitation plan for the minors. Counsel for the minors did not object to the continuance. The juvenile court granted R.F.'s request and set the contested review hearing for June 26, 2015, and a pretrial status conference for May 20, 2015.

The juvenile court also raised the issue of Ahmed, Sr.'s, expected release from confinement at the hearing and ordered that he be provided Agency-supervised

8

visitation.[4]  The court ordered that Ahmed, Sr., be precluded from visiting the children at R.F.'s home without Agency supervision.  The juvenile court also invited comments from the de facto parents.  Priscilla's de facto mother asked that increased visitation for R.F. with Priscilla occur gradually because she believed Priscilla needed "a lot of preparation to make any kind of large changes, even when it's a diaper change."  Abraham and Christian's de facto mother made the same request for them.  The juvenile court directed the Agency to work with all parties to ensure increased visitation occur gradually.

Approximately one week before the May 20, 2015 status conference, R.F. moved into her new home.  At the status conference, R.F. and the Agency requested that the review hearing be continued to July 24, 2015.  The Agency's counsel indicated R.F. was ready to begin overnight extended visitation with the three youngest minors and that the Agency anticipated she would begin extended visitation with the five older children shortly as well.  The court set an additional pretrial status conference for July 8 and continued the trial on the contested review hearing to July 24.

Then, on June 12, 2015, the Agency filed a section 388 petition seeking supervised visitation for R.F.  The petition alleged that on May 22, 2015, just two days after a team decision making meeting with both parents to discuss expanded visitation (at which R.F. was reminded she could not supervise visitation for Ahmed, Sr.), R.F. permitted Ahmed, Sr., to visit the minors in her home without supervision.  The Agency learned of the event after Ahmed, Jr., and Joseph's foster mother reported that Ahmed, Jr., told her

---

4      In advance of the hearing, the Agency reported that Ahmed, Sr., was projected to be released from prison early on May 20, 2015.

he had seen Ahmed, Sr., at the family's home and that both parents told the minors not to tell anyone.

As a result of the incident, the Agency conducted an investigation.[5]  When they were interviewed, both parents admitted Ahmed, Sr., had been at the home for a brief period of time the weekend following the team decision making meeting.  R.F. explained they had a birthday party for a young relative and that Ahmed, Sr., brought a gift and some food, but that he stayed at the party only a few minutes.  R.F. told the twins not to tell anyone because they "exaggerate things."  R.F. said that Ahmed, Sr., came at night and she hoped the kids would be sleeping and would not see him.  She denied that she and Ahmed, Sr., were in a romantic relationship, but said that since his release he visited her at the house two or three times a week when the minors were not there.  Ahmed, Sr., corroborated R.F.'s account of the incident.

After learning Ahmed, Sr., visited R.F.'s home, the Agency unilaterally suspended R.F.'s unsupervised visitation.  At the June 16, 2015 hearing on the Agency's section 388 petition the juvenile court ordered R.F.'s visits be supervised in the family home, but gave the Agency discretion to allow unsupervised visitation.  The juvenile court found the Agency had made a prima facie showing on the petition and set an evidentiary hearing

---

5    Several unrelated allegations were raised in the investigation, but were not substantiated.  Specifically, Joseph told the Agency's social worker that he witnessed R.F. hit Abraham on his arm after he threw a temper tantrum.  M.P.'s foster father told the Agency's social worker that he saw R.F. cover H.B.'s mouth when H.B. interrupted her, and that the same day R.F. told the foster father she was frustrated with the minors and wanted "to spank them all."

for July 24, 2015, the same day as the contested review hearing. The court also reserved an additional day for the hearings and set a status conference for July 8, 2015.

B. *Initial Contested Review Hearing*

Before the status conference, the CASA's for Joseph and Ahmed, Jr., and for Christian, Abraham and Priscilla provided reports to the Agency. Joseph and Ahmed, Jr.'s, CASA noted that the siblings were bonded and excited to see each other. Priscilla's CASA reported she observed five visits between R.F. and all of the children and noted the children were well taken care of and that the visits were appropriate. Priscilla's CASA also indicated, however, that Priscilla was more anxious and clingy than normal and had begun sleeping poorly.

In its June 29, 2015 status review report for the contested review hearing, the Agency's social worker continued to recommend termination of reunification services and that the court set the permanency planning hearing. The report's author, social worker Teri Dunbar, reported that M.P., R.P., H.B., Christian, Abraham, and Priscilla were dealing with separation anxiety and other emotional trauma attributed to the instability in their lives as a result of the dependency proceedings. Dunbar observed several visits and reported the visits were going well, and also that R.F.'s visits with the minors were consistent. Despite R.F.'s successful participation in services, however, Dunbar believed that R.F. should not be provided with additional time to reunify with the minors. Dunbar noted that R.F. had 18 months to alleviate the protective issues that brought the minors into the system and she had failed to do so. The Agency also submitted three reports by the Foundation's social workers, describing visitation that they

11

had supervised. The three reports praised R.F.'s ability to manage all of the minors and emphasized the strong bond between the siblings. The reports also noted that Priscilla had difficulty transitioning from her foster parents to R.F., but that once Priscilla was in R.F.'s care she was attached to R.F. and her brothers and sisters.

Before the contested hearing, both parents filed motions requesting the continuation of reunification services for an additional six months. The Agency's subsequent report for the July 24th review hearing provided descriptions of additional visitation, including overnight visits, that had occurred since the prior report. The report described R.F.'s interactions with all of the minors as appropriate. The report also attached updates on therapy provided to Priscilla and Christian that had been offered to help them deal with their anxiety in transitioning from R.F. to their foster parents, as well as logs of in-home safety parenting services provided to R.F. R.F.'s in-home safety provider described R.F. as "doing an awesome job." Despite the positive descriptions of R.F.'s interactions with the minors and her participation in services, Dunbar stated, "it appears as though [R.F.] has not truly benefitted from those services" and that "the Agency [was] concerned about her co-dependent relationship with the father." Though both parents denied it, Dunbar reported that she suspected Ahmed, Sr., was living in the family home.

As scheduled, the combined hearing on the Agency's section 388 petition and the contested review hearing began on July 24, 2015. The court heard the testimony of Dunbar, McCann, and an investigator for minors' counsel, Sharaye Hood, who had

worked for the Agency for nine years and was qualified by the court as an expert. The court also admitted the Agency's reports into evidence.

Dunbar testified that the Agency's position was that the minors could not be safely returned to R.F.'s care because she was not capable of getting the minors to school or meeting their medical needs, and because R.F. had allowed Ahmed, Sr., into the home and might do so again, potentially exposing the minors to substance abuse, criminal activity and domestic violence. Hood testified that it was her expert opinion that it would not be detrimental to return the five oldest minors to R.F.'s care because they understood the concept of safety and could report any unsafe situation.

With respect to the three youngest minors, Hood's opinion was that it would be detrimental to place them with R.F. Hood testified she did not think R.F. had yet demonstrated that she could maintain a safe environment for the three youngest, who were still entirely dependent on their caregiver. Hood opined that if R.F. could safely parent the five older children for 30 days, she would no longer find it detrimental to return the three youngest to R.F.'s care. Hood also testified that she did not think that the Agency's decision to suspend visitation and seek supervised visitation for R.F. after Ahmed, Sr., made an unauthorized visit to the family home in May 2015 was appropriate. She stated, "the incident that occurred did not rise to the level that weighed so heavily that the children would ultimately need to just not return to their mother."

McCann testified that it would not be detrimental to return all eight minors to R.F.'s care, so long as a transitional plan was implemented and supportive services were provided to the family. McCann also testified that had the decision been hers to make,

13

she would not have terminated unsupervised visitation based on Ahmed, Sr.'s, visit to the family's home in May. At the conclusion of the hearing, and after argument from each counsel, the court denied the Agency's section 388 petition, reinstating R.F.'s unsupervised visitation, and found that Ahmed, Sr.'s, unauthorized visit did not create a risk of harm to the minors. The court then took the matter under submission and set a further hearing on August 24, 2015, to announce its ruling on the contested review.

On August 24, 2015, the court continued the review under section 352 in order to allow for a 60-day trial visit for all eight minors with R.F. in her home, phased in at the discretion of the Agency. The juvenile court concluded R.F. had complied with her case plan and, therefore, there was no prima facie showing of detriment. However, the court could not conclusively find there would be no detriment to returning the minors to R.F.'s care. The court was concerned about R.F.'s ability to manage the needs of and financially support all eight children. The court noted that there was no prohibition on contact between the parents, but ordered continued supervised visitation for Ahmed, Sr., by someone other than R.F. The court set the continued review hearing for November 13, 2015, with a pretrial status conference on October 26, 2015.

C. *Final Contested Review Hearing*

The Agency's report dated October 6, 2015, authored by Dunbar, stated that R.F. began regular weekend visits, from Friday evenings to Sunday afternoons, with all eight children on September 4, 2015. On September 24, 2015, the visits were expanded for the five youngest minors to start on Thursday mornings. Joseph, Ahmed, Jr., Christian and

14

Abraham began a weeklong visit on September 29th and Priscilla started an overlapping weeklong visit a few days later.

Dunbar reported that she made both announced and unannounced visits frequently when the minors were with R.F. and that the visitation was going well. Although the house was messy because of the number of family members, Dunbar reported that there were no safety hazards. Dunbar also reported that the caregivers of Priscilla, and Abraham and Christian were concerned that Ahmed, Sr., had visited the home when the minors were there. One of the CASA's reported that she had called R.F. and that a man who she suspected was Ahmed, Sr., answered the phone. Dunbar also noted that the twins had told her that on one occasion R.F. had gotten frustrated with them and yelled that she was "going to beat [their] ass." Dunbar reported M.P., R.P., H.B., Christian, Abraham, and Priscilla were in therapy.

In its next report, dated October 26, 2015, the Agency stated all eight children had been in R.F.'s care since October 13th. R.F. had successfully held down her full-time job, arranged child care from family members and friends for the three youngest minors, and with support from the Foundation and the Agency ensured all five school-age minors attended school. The Agency was concerned about R.F.'s ability to maintain financial stability and pay her rent, but reported that the five oldest minors wanted to stay with R.F. permanently and that the home was neat, clean, and free from safety hazards during unannounced visits.

The Agency also reported that Ahmed, Sr., was arrested for violating his probation on October 7, 2015. His probation officer, "Officer Hart," told Dunbar she had spoken

15

with R.F.'s neighbor and that the neighbor stated that before his arrest, Ahmed, Sr., was at R.F.'s home regularly when the minors were present. Officer Hart also told Dunbar she had reviewed Ahmed, Sr.'s, text messages, which suggested he had been in R.F.'s home and at times had been left unattended with the minors.

At the October 6, 2015 status conference, the hearing date was continued to December 18, 2015, to accommodate the court's schedule and another pretrial conference was set for December 7, 2015. The Agency's December 7th report stated the minors continued to live with R.F. and that the Agency continued to recommend the termination of R.F.'s parental rights for all eight minors. In the report, Dunbar stated that the transition to R.F.'s home had been difficult for M.P., the twins, and Priscilla. M.P. told the social worker he missed his foster home. The twins' foster mother, who continued to see them regularly, stated that the boys had become more aggressive and were excessively tired during her visits. Priscilla's foster/de facto parents, who also visited regularly, reported Priscilla was more physically aggressive and had begun using profanity. They also reported Priscilla, by then two years three months old, was "more clingy, less adventurous, less talkative, less outgoing, and less willing to engage," and had a very difficult time transitioning from them to R.F. Priscilla's CASA and her weekly music teacher also reported concerning changes in Priscilla's personality.

Priscilla's CASA and former foster/de facto parents also raised concerns about the adequacy of R.F.'s supervision of Priscilla. They reported minor cuts and scrapes, which R.F. stated were the result of roughhousing with Christian and Abraham. Dunbar also reported that the home was chaotic, as expected, but that there were concerning issues

16

caused by the chaos, including injuries and the minors not getting adequate sleep. None of the children had attended any medical or dental appointments, and R.F. had not yet scheduled Priscilla for her two-year old well child visit. On two occasions, R.F. took Abraham and Priscilla to the emergency room. Abraham fell into the fireplace and had a cut above his eye that required two stitches and Priscilla fell and cut her chin (no stitches or additional care was needed).

Three additional reports were submitted to the court before the contested hearing. A report by Joan Walters, the CASA for Joseph, Ahmed, Jr., Christian, Abraham, and Priscilla at the time;[6] a caregiver information report by Priscilla's de facto parents; and a final addendum report from the Agency. The Agency's final addendum report, dated December 18, 2015, stated that it had received a hotline referral alleging M.P. was hit by R.F. but that it did not have any information substantiating the allegation. In her report, Walters repeated the concerns of Priscilla's de facto parents set forth in the Agency's December 7, 2015 report about Priscilla's recent behavioral and emotional changes. Walters's undated report stated she had visited Priscilla weekly since the 60-day trial visit began and that she had seen Priscilla crying for her de facto parents during two or three of her visits to R.F.'s home. Walters supported the Agency's recommendation to terminate services and set a permanency planning hearing for the eight minors.

---

6     Walters had been Ahmed, Jr., and Joseph's CASA since May 2014 and was appointed as the CASA for Priscilla, Abraham, and Christian on August 27, 2015, when their former CASA resigned.

The report of the de facto parents described Priscilla's change in behavior in great detail, noting that "over the last several months, even before the shift to [R.F.'s] full-time care, Priscilla had become extremely clingy, often completely unwilling to let [the de facto parents] out of her sight or even to put her down on the ground, out of our arms. . . . She remains noticeably and uncharacteristically less willing to explore and play, even within places that are quite familiar. . . . In fact, she is often silent and withdrawn for long periods during our weekly visits with her, on the one hand longing to be held by us for hours at a time but refusing to talk and hiding from almost everyone else who tries to engage her." The report stated, "[e]ven now, after two months of consistent scheduling (that is to say, every night and almost every day at [R.F.'s] house, minus twice-weekly day visits with de facto parents), Priscilla tells us . . . always through tears and sometimes also raging: 'I don't wanna go to Mama's house!' " Priscilla's de facto mother reported each time they returned Priscilla to R.F. after a visit, Priscilla would scream and cry, and sometimes after an outburst withdraw completely and stare into space.

At the December 18, 2015 hearing, the juvenile court confirmed it would be considering the evidence from the two days of hearings in July. The court also received into evidence the Agency's reports and three reports from the minors' CASA's. The court admitted the caregiver information report, but after objection by parents' and minors' counsel excluded some of its content as irrelevant or hearsay. The court also heard additional testimony from Hood and McCann, as well as a new social worker, Monique Lucero, who had taken over the case from Dunbar. Hood testified she had visited R.F.'s home twice since her earlier testimony and that the home was in a safe condition. She

18

testified scrapes on Priscilla were somewhat concerning, but did not rise to a level that would preclude Priscilla from remaining in her mother's care. Hood testified that additional in-home services to assist R.F. with organization and cleaning, as well as weekly therapy for the minors, would be helpful and appropriate.

McCann similarly testified that R.F. could use additional help with organization, but overall the family home was safe and R.F. was providing sufficient care for the minors. McCann also testified that she had worked on budgeting with R.F. and felt that with the new higher-paying job R.F. had recently started and government benefits, R.F. could support the family on her own. With respect to emotional and behavioral changes, McCann's opinion was that after living through months of uncertainty and change it was normal for the youngest minors, who lacked the ability to understand or articulate their feelings, to display upset and act out. She noted that the same kinds of issues arose for Christian and Abraham when they were taken out of their mother's care initially.

After the close of evidence, the court heard closing arguments by counsel for both parents, for the minors, and for the Agency. Both parents' attorneys advocated for the return of the minors to R.F.'s care. Minors' counsel also sought to have all eight minors, who she asserted shared a strong sibling bond, remain in the care and custody of R.F. Minors' counsel stated, "we see from the beginning, way back in July, that the [Agency] has been burden shifting and speculating" and argued the Agency had failed to show that keeping the minors with R.F. would create a substantial risk of detriment. The Agency, emphasizing the "chaotic and extremely marginal" character of R.F.'s home and its

19

concerns regarding R.F.'s judgment with respect to Ahmed, Sr., asserted it had met its burden of proof.

Before announcing its decision, the juvenile court noted that "this [was] probably the hardest evaluation" the court had ever made. With respect to the seven older minors, the court also stated that "under the law" it was making "a decision that [it was] not sure [was] going to serve the children's long-term interest . . . ." The court concluded that the Agency had failed to meet its burden with respect to these minors, but that it had shown a substantial risk of detriment to Priscilla if she were to remain in R.F.'s care. The court stated that between the reports of the social workers and the caregiver information form, it found Priscilla was suffering. Further, after being out of her mother's care for 21 months, Priscilla had a "serious emotional problem" as a result of being transitioned back to R.F. for the trial visit. The court also pointed to the abrasions Priscilla had recently sustained, and concluded they showed inadequate supervision. The court further found that R.F. and Ahmed, Sr., had violated its orders concerning visitation and this also showed a likelihood of future detriment. Finally, the court stated its preference that Priscilla be returned to the care of her former foster family.

As to Priscilla only, the juvenile court terminated family reunification services to R.F. and Ahmed, Sr., and set a section 366.26 permanency planning hearing for April 13, 2016.[7] Both parents and the minors timely filed notices of intent to petition for

---

7    The court ordered Priscilla's seven siblings remain in R.F.'s care and that the family be provided with maintenance services. The court also set a status conference in 90 days to assess the family's progress.

20

extraordinary review. In their petitions the minors and R.F. requested that this court stay the permanency planning hearing. This court initially denied the request, but after the Agency requested an extension of time to file its response to the petition, we stayed the April 13, 2016 hearing pending further order of this court.[8]

DISCUSSION

As stated, the petitions challenge the sufficiency of the evidence supporting the juvenile court's finding that returning Priscilla to R.F.'s care "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."[9] (§ 366.22, subd. (a)(1).) We reject the challenges and affirm the trial court's order.

I

As an initial matter, in its response to the petitions, the Agency asserts Priscilla's seven siblings lack standing to challenge the juvenile court's ruling. It is not just Priscilla's siblings, however, that have brought the petition for extraordinary relief. Rather, Priscilla herself challenges the juvenile court's order. The Agency correctly notes a minor child and his or her parents are parties to that specific minor's dependency

---

[8] Priscilla's siblings also filed a "Notification of Incomplete Record" and "Motion to Augment the Record" with this court seeking to correct the record to include missing documentation filed separately for them and to supplement the record with minute orders and the reporter's transcript for a special hearing set for January 6, 2016. We granted the requests, but the documents pertaining to the January 6, 2016 hearing were not filed with this court and none of the parties refer to those proceedings in their briefing.

[9] Ahmed Sr. did not file a brief in support of his petition. Instead, only joining in the arguments asserted by R.F. and the minors.

21

proceeding.  Although the law is not settled as to whether siblings alone may challenge an order under section 366.22, subdivision (a)(1) by extraordinary writ, we find it unnecessary to reach that issue here, where minors' counsel is challenging the order on behalf of Priscilla herself.  (See *Kaiser Foundation Health Plan, Inc. v. Superior Court* (2012) 203 Cal.App.4th 696, 715 [declining "to review an issue that will have no effect on the parties"].)

II

A

When a child is removed from parental custody, unless specified exceptions apply, the juvenile court must order family child welfare services for the child and the parent to facilitate family reunification.  (§ 361.5, subds. (a), (b).)  For a child who is under three years of age on the date of the initial removal from parental custody, reunification services are presumptively limited to six months, and may be provided "no longer than 12 months from the date the child entered foster care."  (§ 361.5, subd. (a)(1)(B).)

At the 12-month review hearing, however, if the child is not returned to parental custody, the juvenile court has the discretion to continue the case to the 18-month review date, set a section 366.26 hearing, or order a permanent plan of long-term foster care for the child.  (§ 366.21, subd. (g)(1), (2) & (3).)  Section 361.5, subdivision (a)(3), provides that "court-ordered services may be extended up to a maximum time period not to exceed 18 months" after the child was originally removed from parental custody if the juvenile court finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent and safely maintained in the home within the

22

extended period of time, or that reasonable services have not been provided to the parent. (§§ 361.5, subd. (a)(3), 366.21, subd. (g)(1).)

At the 12-month review hearing, and the 18-month review hearing if the case is continued to that point, the juvenile court must "order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  (§ 366.21, subd. (f)(1); § 366.22, subd. (a)(1); see *In re Marilyn H.* (1993) 5 Cal.4th 295, 308.)  At a review hearing, the focus is on the child's well-being, rather than on the initial grounds for juvenile court intervention. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.)  The code specifies that the social worker carries "the burden of establishing detriment."  (§ 366.22, subd. (a)(1).)

The reviewing court must affirm an order setting a section 366.26 hearing if it is supported by substantial evidence.  (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020.)  "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874; *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

As the juvenile court recognized, this case is complicated by the sheer size of the family.  There is no question, as many of the witnesses to this proceeding noted, that a household with eight children under the age of 12 is a naturally chaotic atmosphere.  The juvenile court's detriment finding with respect to Priscilla, however, was not based only on the number of children involved or the disorder they created, but also on evidence before the court showing concerning changes in Priscilla's demeanor and mental well-being.

At the contested review hearing, the juvenile court concluded that it could not find detriment to returning Priscilla's seven older siblings to R.F.'s care.  The court's statements in support of its ruling show it took care to evaluate the evidence for each minor's situation individually.  The court made clear it had doubts that its decision for the seven oldest minors was in their best interest, but that it could not find the Agency had met its burden to show that allowing them to remain in R.F.'s care was likely to "create a substantial risk of detriment to" their "safety, protection, or physical or emotional well-being."  (§ 366.22, subd. (a)(1).)

The court did not reach the same conclusion for Priscilla, instead finding a substantial likelihood of detriment for three primary reasons:  First, the court concluded that Priscilla was suffering emotionally in R.F.'s care and, as a result of the extended trial visit, was experiencing a "serious emotional problem."  Second, the court found Priscilla had an increased number of minor injuries caused by her siblings' roughhousing, which showed a lack of adequate supervision for a child of Priscilla's age.  And third, that R.F.

and Ahmed, Sr.'s, violation of its order precluding Ahmed, Sr., from visiting the minors without a supervisor other than R.F., showed a likelihood of future detriment to Priscilla.

The second and third reasons outlined by the trial court in support of its order do not alone support its detriment finding. There was no testimony that any of the injuries Priscilla suffered were worse than those of her two siblings closest to her in age, who were just one and two years older. Likewise, with respect to the violation of the visitation order, we do not see any basis to treat Priscilla differently than Christian and Abraham; none of these young minors could protect themselves from Ahmed, Sr. The evidence of the emotional turmoil and pain Priscilla experienced during the last six months of the proceeding, however, was not present for any of the other minors and was sufficient to support the trial court's order.

Specifically, the Agency's assessment of Priscilla's well-being, the reports by Priscilla's de facto parents and her CASA, and the letter by Priscilla's music teacher showed Priscilla was suffering in R.F.'s care. The caregivers reported that Priscilla was a different child after her visitation with R.F. increased. Her sleep was disrupted, and she became inconsolable when she was left with R.F. and asked for her de facto parents even days after being in R.F.'s care. She also became more aggressive towards others and used inappropriate language, and was despondent and anxious when she engaged in activities she previously enjoyed. The trial court found this evidence credible and it is not this court's role to second guess that determination. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52.)

25

The petitioners correctly assert that "the existence of a successful relationship between a foster child and foster parent cannot be the sole basis for . . . depriving the natural parent of custody in a dependency proceeding." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 418 (*Jasmon O.*).) Importantly, however, "courts may place great weight on evidence that after a substantial period in foster care, the severing of a bond with the foster parents will cause long-term, serious emotional damage to the child." (*Id.* at pp. 418-419.) We do not agree with petitioners that the juvenile court's order was improperly based on a comparison of the quality of Priscilla's relationship with her foster parents to her relationship with her biological family. Unlike *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495 (*Rita L.*), on which petitioners rely, there was no evidence that Priscilla's foster parents did not support R.F.'s reunification efforts or that the court based its decision on the quality of life Priscilla had with her foster family. To the contrary, Priscilla's de facto parents consistently helped facilitate regular visitation for R.F. and Priscilla's siblings. Even in their caregiver report describing the significant negative change in Priscilla's behavior, the de facto parents did not recommend any specific outcome and instead only urged the court not to delay its decision.[10]

10   In *Rita L.* the social service agency repeatedly reported to the juvenile court its belief that the foster/de facto parents were "attempting to undermine the reunification efforts" and the agency did not support the termination of reunification services. (*Rita L.*, *supra*, 128 Cal.App.4th at pp. 500-501.) The agency's reports noted "that not only had [the mother] complained that the foster mother was trying to 'subtly sabotage' [her] commitment to sobriety, but also that members of [the agency]'s staff had reported the foster parents had attempted to 'engage them in conversation critical of the [assigned social worker's] management of this case and of the biological parents.' [The agency's] concerns about the foster parents' behavior even prompted it to consider removing [the

We also reject petitioners' contention that there was no evidence to establish that the cause of Priscilla's emotional trauma—evidenced by her changed behavior—was attributable to R.F.'s actions. R.F. had a significant history of involvement with the Agency and it was her actions (and those of Ahmed, Sr.) that brought the family into the dependency system. As the minors point out in their petition, this "evidence supports the conclusion that [Priscilla's behavior] was likely caused by Priscilla leaving her foster parents for visits with mother, and leaving her mother for visits with her foster parents, and leaving her siblings after visits, and going back and forth from a home where she was an only child to a home with seven siblings, from discontinuing attendance at her preschool, from going from a home were she resided for [21] months, to a home where

minor] from their custody. Ultimately, however, [the agency] determined the disruption of such a move would not be in [the minor's] best interests—*despite a consensus opinion of* [agency] *staff that the foster parents 'were not in substantial agreement with the goal of Family Reunification.'* " (*Ibid.*) The juvenile court's order indicated that its decision was based, at least in part, on the quality of life the minor experienced with her foster family. (*Id*. at pp. 507-508.)

The minors also quote *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*), which warned against trial and appellate courts simply comparing "the household and upbringing offered by the natural parent or parents with that of the caretakers" when evaluating a petition for modification seeking to reinstate reunification services after the permanency planning hearing has been set. (*Id*. at p. 529.) The *Kimberly F.* court stated, "whether a child is reared in a more mainstreamed or socioeconomically advantaged household is not dispositive under section 388. It is not, after all, in the court's authority to 'play God' and determine which of two households a child should have been born into." (*Ibid.*) Rather, in evaluating a petition, the court must look at the bigger picture and consider the familial attachments and bonds between parents and siblings. (*Id*. at pp. 529-530.) While we are sympathetic to the desires of R.F. and the minors to maintain their relationships, as discussed, the juvenile court's finding that continuing the proceeding past the 18-month point would be detrimental to Priscilla was supported by sufficient evidence. Further, the court was not conducting a best interest analysis and the petitioners point to no evidence suggesting that the juvenile court compared R.F.'s ability to care for to Priscilla to the ability of the de facto parents. Rather, the court focused on R.F. and on Priscilla's behavior while in R.F.'s care.

27

she had never lived before, and that it was the result of Priscilla's development age and confusion created from going back and forth between her mother and foster parents." This assessment of the reasons for Priscilla's behavior is fundamentally correct. However, it was R.F.'s and Ahmed, Sr.'s, behavior that caused the upheaval in Priscilla's life and which led to the emotional pain she was experiencing by the time of the review hearing. At that point Priscilla had been in foster care for 24 of her 27 months of life and, as a result, she experienced significant emotional trauma. The evidence of that trauma sufficiently supported the court's detriment finding.[11] (See *Jasmon O., supra*, 8 Cal.4th

---

[11] The petitioners assert R.F.'s one setback in this case, violating the juvenile court's visitation order by permitting Ahmed Sr. to come to her home after his release from custody in May is analogous to the situation presented in *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 (*David B.*) and that *David B.* supports reversal here. In *David B.*, the Court of Appeal rejected the juvenile court's conclusion that the social services agency had met its burden to show that placing the three-year old minor in her father's care created a danger to her physical or emotional well-being. The juvenile court's ruling was "based in large part on the fact that David [, the father,] consulted frequently with the foster mother and the social worker during the time he was caring for [the minor], thus demonstrating his own inability to deal with the every day issues of parenting." (*Id*. at p. 790.) The appellate court rejected this finding, holding that it did not show a likelihood of detriment. The example the juvenile court gave (David calling the foster parents to find out his daughter's meal preferences) was unrelated to the "essential question of whether" the minor's "safety, protection, physical or emotional well-being would be placed at substantial risk . . . ." (*Ibid*.) Rather, David's "willingness to seek assistance" as "a new father inexperienced in dealing with a small child, and apparently far more afraid of making a mistake than appearing stupid" demonstrated parental fitness. (*Ibid*.) Further, even David's social worker "could not say David lacked sufficient parenting skills" to be given custody of his daughter and there was no other significant evidence before the court demonstrating David's inability to parent his young daughter. (*Id*. at p. 791.)

We agree with the petitioners that R.F.'s violation of the visitation order, by itself, was not enough to establish a risk of substantial danger to Priscilla's well-being. However, the evidence concerning the emotional suffering Priscilla had experienced by the time of the hearing was sufficient.

at p. 419 ["when a child has been placed in foster care because of parental neglect or incapacity, after an extended period of foster care, it is within the court's discretion to decide that a child's interest in stability has come to outweigh the natural parent's interest in the care, custody and companionship of the child"].)

Finally, the minors point to Priscilla's strong bond with her siblings as a reason for this court to reevaluate the juvenile court's detriment finding. The evidence of this bond, however, does not negate the evidence of emotional detriment that supported the court's order. While we are sympathetic to the minors' strong desire to maintain their relationship with each other, as the Agency correctly notes, the role of this court is limited. (See *In re Casey D., supra*, 70 Cal.App.4th at pp. 52-53 ["It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence."].) The juvenile court heard the testimony of the witnesses and was entitled to accept the Agency's social worker's assessment of the actual and potential detriment to Priscilla over the contrary assessments by McCann and Hood. We cannot reweigh or reevaluate that evidence.

DISPOSITION

The petition is denied.  The stay issued March 25, 2016, is vacated.


BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


AARON, J.